399 So.2d 248 (1981)
Joseph I. HARPER, Jr., Tula Ann Harper, Raymond Youngman, Margaret J. Youngman, Elizabeth S. Staggs, Lillian L. Wilson, Linda Watts
v.
REGENCY DEVELOPMENT COMPANY, INC., Champion Construction Co., Inc., Ellard Contracting Co., Inc.
80-19.
Supreme Court of Alabama.
May 1, 1981.
Rehearing Denied June 5, 1981.
*249 Rodney A. Max of Denaburg, Schoel, Meyerson & Ogle, Birmingham, for appellants.
John F. Whitaker of Sadler, Sadler, Sullivan, Sharp & Stutts, Birmingham, for appellees.
Fournier J. Gale, III, and H. Thomas Wells, Jr., of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, for Drummond Coal Co.
JONES, Justice.
The claims upon which this appeal is based arise out of Appellees' blasting operations on Red Mountain in Birmingham, Alabama, during the months of June, July and August of 1978.[1]
Plaintiffs-Appellants are members of a residential community located on the slope of Red Mountain. Plaintiffs initiated these claims in 1979 in the district court, seeking compensation for property damage allegedly caused by Appellees' blasting operations during development of a condominium complex near the crest of the mountain.
Subsequent discovery revealed that the actual costs of repairs to Plaintiffs' residences were in excess of the jurisdictional amount of the district court ($5,000). By the time the amount of actual damages became known, however, expiration of the statute of limitations prevented dismissal and refiling of the actions in the circuit court. Consequently, Appellants amended their claims so as to remain within the district court's jurisdiction.
Upon a finding for Appellees in the district court, Appellants appealed to the circuit court and amended their complaints to claim their actual damages. Thereupon, the circuit court granted Appellees' objections to the amendments and motions to dismiss Count 1 of each of Appellants' complaints. Dismissal of Count 1 of each complaint was predicated upon grounds that it was based solely upon "strict liability" (Coalite, Inc. v. Aldridge, 285 Ala. 137, 229 So.2d *250 539 (1969)), while denial of Appellants' amendments to the ad damnum clauses was based upon ARCP 13(j). We affirm as to the order denying the amendments; we reverse and remand as to the order dismissing Count 1 of each complaint.

APPELLEES' CONTENTIONS FOR AN APPLICABLE LIABILITY STANDARD
Understandably, the position advanced by Appellees is a plea for application of the doctrine of stare decisis: To establish liability for damage allegedly caused by blasting operations, the burden is upon the Plaintiff to allege and prove that such damage was the result of Defendant's negligence and not the result of blasting conducted in accordance with usual methods and a reasonable standard of care. Mitchell v. Richardson, 277 Ala. 651, 173 So.2d 814 (1964); Vulcan Materials Co. v. Grace, 274 Ala. 653, 151 So.2d 229 (1963); Ledbetter-Johnson Co. v. Hawkins, 267 Ala. 458, 103 So.2d 748 (1958).
As a corollary, Appellees urge that strict liability is an unnecessary and unreasonable standard to impose in blasting cases in that: 1) Blasting is a reasonable and necessary activity in developing land, Cratty v. Samuel Aceto & Co., 151 Me. 126, 116 A.2d 623 (1955); 2) Liability without fault is an unreasonable and unnecessarily restrictive doctrine, Klostermann v. Houston Geophysical Co., 315 S.W.2d 664 (Ct.App.Tex.1958); 3) Rylands v. Fletcher, L.R. 3 H.L. 330 (1868), as proposed by Appellants, arguably adopts a negligence standard as opposed to one of strict liability, Toy v. Atlantic Gulf & Pacific Co., 176 Md. 197, 4 A.2d 757 (1939); 4) To apply a standard of liability without fault would amount to judicial legislation, Coalite, Inc. v. Weeks, 284 Ala. 219, 224 So.2d 251 (1969); 5) Proof of negligence is not an unreasonable burden in blasting cases, Crawford Coal Co. v. Stephens, 382 So.2d 536 (Ala.1980).

HISTORY
The history of this State's application of standards of liability in blasting cases is succinctly and aptly set forth in Appellants' brief:
"Since 1907, persons injured or damaged... by the concussion or vibration caused by blasting have been without a remedy, unless they could show that the blaster was negligent in his blasting operations. In effect, blasters in Alabama have been allowed to cause injury and damage to surrounding property so long as they do it carefully. This ... approach to liability for blasting is derived from traditional common law dichotomies of trespass/negligence (trespass on the case) and direct injury/indirect injury. These dichotomies may be explained as follows: If rocks are thrown onto plaintiff's property, there is a trespass because of the direct injury, and the defendant is liable without fault.[2] If, however, the damage was caused by concussion in the air or vibration in the ground, the injury is caused indirectly, and the remedy lies in trespass on the case for which the plaintiff must prove negligence in the blasting.[[3]]"
See, also, Rendlemen, More on Procedure Reform, 33 Ala.Law. 37, 44 (1972).
A majority of states now characterize blasting, under certain conditions, as an abnormally dangerous activity and apply a strict liability approach for injury or damage caused thereby. Restatement (Second) of Torts, §§ 519-524A (1977). This Court, in Borland v. Sanders Lead Co., 369 So.2d 523 (Ala.1979), hinted at the need to reconsider this State's application of the trespass/trespass on the case dichotomy associated *251 with damage caused by blasting operations.[4]
Under a traditional standard of negligence approach, the plaintiff must specifically show negligent conduct in the operative blasting procedures that proximately caused damage. In essence, the plaintiff's evidentiary hurdles are two-pronged: 1) proving that the defendant's conduct fell below the industry's acceptable standard of care; and 2) proving that such conduct proximately caused the damage suffered.
Both prongs of proof set the stage for a battle of the experts. The first prong, in the absence of statutory or regulatory guidelines, places the plaintiff's expert against the defendant's expert in a contest to determine the industry's empirical standard of care. Republic Steel Corp. v. Peoples, 217 F.2d 236 (5th Cir. 1954).[5] The latter prong pits the plaintiff's evidence of before and after damagein the context of circumstantial cause and effectagainst the defendant's expert, who testifies that the damage is not the result of the blasting.
In light of the subjective nature of any scientific criteria, fostered by disagreement among industry experts, creation of an acceptable standard of conduct becomes extremely difficult. At any rate, the present status of the law, when strictly applied, leaves the fact finder bound by standards established and practiced by the very industry sought to be held accountable, and not by any consideration of the abnormally and inherently dangerous character of the instrumentality or substance employed and the intrinsic risk of harm to others.
In recognition of the harshness of the traditional negligence standard of liability, this Court has relaxed the requisite standard of proof in blasting cases. In Ledbetter-Johnson Co. v. Hawkins, 267 Ala. 458, 103 So.2d 748 (1958), a plaintiff's judgment was affirmed where the expert testimony showed only that if plaintiff's "damage was done ... in the obtaining of chert from this pit by the use of dynamite ..., it would be because it was not done properly, was done in a negligent manner." Admittedly, such conclusionary evidence, even by an expert without any predicate as to the usual and customary practice in the industry or as to the manner in which defendant's conduct deviated therefromfalls far short of the requisite standard of proof in traditional negligence cases. See, also, Crawford Coal Co. v. Stephens, 382 So.2d 536 (Ala.1980), and the cases cited therein.
Additionally, this Court has consistently treated blasting claims as actions in trespass, thus applying absolute liability, where rocks or other debris were thrown upon plaintiff's property without any differentiation between the precise damage caused by the trespassing objects and any simultaneous damage caused by concussion or vibration. See Milford v. Tidwell, 276 Ala. 110, 159 So.2d 621 (1963); Ex parte Birmingham Realty Co., 183 Ala. 444, 63 So. 67 (1913); Bessemer Coal, Iron and Land Co. v. Doak, 152 Ala. 166, 44 So. 627 (1907).
While this accommodation to plaintiff's heavy burden of proof has not overtly altered the standard of liability, at the very least it has tended to treat the dangerous condition created by the ultrahazardous activity as the basis for testing the requisite proof of fault. Indeed, the Doak Court observed that where blasting takes place in the midst of "a thickly settled city," one "acts at his peril."
*252 STRICT LIABILITY IN TORT
In the now famous case of Rylands v. Fletcher, supra, the defendants were mill owners who had constructed a reservoir on their land. Water escaped therefrom into an abandoned coal mine through connecting passages and into the adjoining mine of the plaintiff. In the absence of trespass (the flooding damage being indirect) or the existence of any nuisance, the English court applied the doctrine of strict liability in tort to hold defendants liable, saying:
"We think that the true rule of law is that the person who for his own purposes brings on his land and collects and keeps there anything likely to do mischief if it escapes, must keep it at his peril, and if he does not do so is prima facie answerable for all the damage which is the natural consequence of its escape."
Fletcher v. Rylands, L.R. 1 Ex. 265, 279-80 (1866).
This holding was somewhat restricted upon review by the House of Lords, wherein the strict liability principle was made applicable only to "non-natural" uses of defendant's land, as distinguished from "any purpose for which it might in the ordinary course of the enjoyment of land be used." Rylands v. Fletcher, supra.
"After a long period during which Rylands v. Fletcher was rejected by the large majority of American courts which considered it, the pendulum has swung to acceptance of the case and its doctrine in the United States." W. Prosser, Handbook of the Law of Torts, § 78 (4th ed. 1971).
Adherence to the strict liability doctrine has been approved by the Restatement (Second) of Torts (1977), § 519 of which provides:
(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

AN ABNORMALLY DANGEROUS ACTIVITY CONSTITUTES NEGLIGENCE
We believe our adoption of the Restatement lightens the requisite burden of proof without abandoning the time-honored fault philosophy. Whether we adopt, by name, strict liability in tort for damages caused by blasting operations, or whether we perceive our holding as a mere expansion of prior cases, is relatively unimportant. What is important, in our view, is the preservation of our fault-based tort concept in the context of a modified standard of liability which no longer perpetuates what Professor Prosser terms "a marriage of legal technicalities with scientific ignorance." W. Prosser, Handbook of the Law of Torts, § 78 (4th ed. 1971).
The fault concept is preserved simply by transposing the basis for testing culpability from the degree of care exercised in the manner in which the blasting operation is conducted to the conduct of the blaster in carrying on an abnormally dangerous activity which subjects innocent parties to an unreasonable risk of harm. To treat the discharge of an abnormally dangerous substance under ultrahazardous conditions as wrongful conduct is not violative of the duty/breach of duty principle of tort law. The use of the explosives under abnormally dangerous conditions is negligence, and thus actionable if such conduct proximately causes damage to another.
Our holding today is strikingly similar, both in kind and degree, to the Alabama extended manufacturer's liability doctrine. Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976); Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976). There, we lessened the consumer's burden of proof, but retained the fault concept, by transposing the basis for testing culpability from the degree of care exercised in the manufacturing process to the product's defective condition at the time of sale. Here, we simply shift the culpability test from the degree of care exercised in the discharge of *253 the explosives to the carrying on of an abnormally dangerous activity. See Henderson v. Wade Sand and Gravel Co., Inc., 388 So.2d 900 (Ala. 1980), which altered the requisite burden of proof from that of traditional negligence to that of nuisance in the context of property damage caused by a continuing activity involving use of underground water.
While our law no longer permits, as a defense, proof of the degree of care with which a defective product was made and sold to the public, neither will it permit the blaster to defend on the ground that he carefully prepared and detonated the explosive. In either case, to carefully injure another is no longer an acceptable exercise of one's legal duty of due care.
In neither case, however, is the claimant exempt from definitive standards of proof both as to culpability and as to proximate cause. Just as the plaintiff must prove the defective condition of the product and an injury or damage proximately resulting therefrom, one claiming blasting damage can establish liability of the blaster only by proving that such damage is the proximate result of an abnormally dangerous activity.

AN ABNORMALLY DANGEROUS ACTIVITY
The Restatement (Second) of Torts, § 520 (1977), sets forth the following factors to be considered in determining whether an activity is abnormally dangerous:
(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.
It is apparent that liability for an abnormally dangerous activity arises out of the intrinsic danger of the ultrahazardous activity itself and the risk of harm it creates to those in the vicinity. Restatement (Second) of Torts, § 519, Comment d (1977). The basis for liability is that one who for his own purposes creates an abnormal risk of harm to his neighbors must be responsible for relieving that harm when in fact it does occur. Id.
The rule of strict liability, however, only applies to that harm which is within the scope of the abnormal risk upon which liability is based. In other words, one who detonates explosives on his own property may be responsible for the risk of harm to persons or property in the vicinity. If, however, no explosion takes place, but someone trips over the dynamite and breaks a leg, strict liability will not apply. Restatement (Second) of Torts, § 519, Comment e (1977).
Our adoption of the Restatement is not a holding that the mere act of blastinganytime, anywherewill subject one to liability without fault. The Restatement (Second) of Torts, § 519 (1977), speaks of "abnormally dangerous activities." Thereafter, § 520 provides guidelines against which to test the appropriateness of the blasting operations. Each case will present its own set of facts against which the § 520 guidelines will apply.[6]
A finding, guided by a consideration of factors outlined in the Restatement, that the blaster was "one who carries on an abnormally dangerous activity" is a finding of negligencethe breach of a legal duty and, a further finding that such conduct proximately damaged another, renders the blaster liable therefor. Ordinarily, both of these determinations will be issues of fact for the jury.[7]
*254 We hold, therefore, that the trial judge's dismissal of Count 1 of each of Appellants' complaints was reversible error.

AD DAMNUM CLAUSE AMENDMENTS
The trial court's rejection of claimants' offered amendments to increase their prayer for damages above the jurisdictional level of the district court is mandated by ARCP 13(j). Plaintiffs had the right to claim only a portion of their damages in order to remain within the jurisdiction of the district court; but, by doing so, they destroyed their right, on appeal to the circuit court, to claim the excess. See Hardy v. Tabor, 369 So.2d 559 (Ala.Civ.App.1979).
The constitutional issue raised by Appellants is without merit. Therefore, that portion of the trial court's order sustaining the Appellees' objection to Appellants' amendments is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, FAULKNER, SHORES and ADAMS, JJ., concur.
TORBERT, C. J., and ALMON, EMBRY and BEATTY, JJ., dissent.
EMBRY, Justice (dissenting):
Before addressing the substantive bases for my views contrary to those of the majority, I feel compelled to express my incredulity that these cases involving an amount in controversy of five thousand dollars each are being considered by this court rather than the Court of Civil Appeals. Affirmance by the majority of the order denying the amendments to plaintiffs' complaints seeking more than five thousand dollars as damages is positive concession that these appeals are not within the jurisdiction of this court. To rule otherwise, the majority would, perforce, repeal Rule 13(j), ARCP.
Regarding the substantive holding and content of the majority opinion, I would summarize my views by stating: If it ain't broke, don't fix it. I do not think the law in Alabama regarding liability for blasting needs changing; therefore, I would not tamper with it.
It seems to me that adopting a rule of strict liability in cases of the nature of those here before us, is not only unnecessary and undesirable but will inevitably lead to severe inhibition of needed development of natural resources vital to the survival of a viable industrialized economy and a society with adequate energy, food, shelter, and creature comforts to make life in that society more than mere organic existence.
Under our system of accountability for one's acts that damage another, we have studiously attempted to adhere to the concept of fault; even when it became necessary to balance the burden between the injured and those responsible for the injury in the case of manufactured goods. See Casrell and Atkins, cited in the majority opinion.
I see no need for a prolix convoluted discussion of the various approaches taken by the courts to determine the nature of the cause of action accruing as the result of damage in consequence of blasting depending upon whether that damage results from vibration, concussion or from casting inanimate objects upon the person or property of another. The simple fact is that the negligence standard as applied in Alabama is a reasonable one and neither places an undue burden of proof on the plaintiff nor presents him with anything approaching an impossible task. No plaintiff is bound by a standard of care of defendant that merely conforms to an acceptable standard to those industries engaged in blasting activities. Proof of proximate cause of damage from blasting is a common sense matter which can be shown by any relevant and material evidence, even if it be circumstantial. E. g., see Cratty v. Samuel Aceto & Co., 151 Me. 126, 116 A.2d 623 (1955).
*255 As aptly put by appellees: "It, therefore, becomes clear that the negligence standard as applied to blasters is not just an empirical standard, but involves matters of location, severity, necessity, propriety and techniques, among others. In other words, negligence `according to the relative circumstances' is a much sounder and more applicable standard." Illustrating the ease of carrying plaintiffs' burden and the liberality of proof required to sustain that burden are the facts of Crawford Coal Co. v. Stephens, 382 So.2d 536 (Ala.1980).
In conclusion: the decision of the majority in this case is not needed; it departs from a well settled body of law with which the bench and bar are familiar; it raises new questions to be resolved without justifiable or desirable results to be served by their resolution, and last but not least, it places an undue burden upon industry without achieving a concomitant desirable social or economic objective.
TORBERT, C. J., and ALMON and BEATTY, JJ., concur.

APPENDIX

Chapter 21

ABNORMALLY DANGEROUS ACTIVITIES
Section
519. General principle
520. Abnormally dangerous activities
520A. Ground damage from aircraft
520B. Liability to trespassers
520C. Liability to licensees and invitees
521. Abnormally dangerous activity carried on in pursuance of a public duty
522. Contributing actions of third persons, animals and forces of nature
523. Assumption of risk
524. Contributory negligence
524A. Plaintiff's abnormally sensitive activity
§ 519. General Principle
(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.
Comment:
a. The general rule stated in this Section is subject to exceptions and qualifications, too numerous to be included within a single Section. It should therefore be read together with §§ 520 to 524A, by which it is limited.
b. As to the factors to be considered in determining whether an activity is abnormally dangerous, see § 520.
c. The word "care" includes care in preparation, care in operation and skill both in operation and preparation.
d. The liability stated in this Section is not based upon any intent of the defendant to do harm to the plaintiff or to affect his interests, nor is it based upon any negligence, either in attempting to carry on the activity itself in the first instance, or in the manner in which it is carried on. The defendant is held liable although he has exercised the utmost care to prevent the harm to the plaintiff that has ensued. The liability arises out of the abnormal danger of the activity itself, and the risk that it creates, of harm to those in the vicinity. It is founded upon a policy of the law that imposes upon anyone who for his own purposes creates an abnormal risk of harm to his neighbors, the responsibility of relieving against that harm when it does in fact occur. The defendant's enterprise, in other words, is required to pay its way by compensating for the harm it causes, because of its special, abnormal and dangerous character.
*256 Comment on Subsection (2):
e. Extent of protection. The rule of strict liability stated in Subsection (1) applies only to harm that is within the scope of the abnormal risk that is the basis of the liability. One who carries on an abnormally dangerous activity is not under strict liability for every possible harm that may result from carrying it on. For example, the thing that makes the storage of dynamite in a city abnormally dangerous is the risk of harm to those in the vicinity if it should explode. If an explosion occurs and does harm to persons, land or chattels in the vicinity, the rule stated in Subsection (1) applies. If, however, there is no explosion and for some unexpected reason a part of the wall of the magazine in which the dynamite is stored falls upon a pedestrian on the highway upon which the magazine abuts, the rule stated in Subsection (1) has no application. In this case the liability, if any, will be dependent upon proof of negligence in the construction or maintenance of the wall. So also, the transportation of dynamite or other high explosives by truck through the streets of a city is abnormally dangerous for the same reason as that which makes the storage of the explosives abnormally dangerous. If the dynamite explodes in the course of the transportation, a private person transporting it is subject to liability under the rule stated in Subsection (1), although he has exercised the utmost care. On the other hand, if the vehicle containing the explosives runs over a pedestrian, he cannot recover unless the vehicle was driven negligently.
Illustration:
1. A, with reasonable care, carries on blasting operations in a closely settled rural district. A has no reason to know of the presence of B's mink ranch nearby. The noise of the blasting frightens the mink and the fright causes them to kill their young. A is not subject to strict liability to B for the loss of the mink.
§ 520. Abnormally Dangerous Activities
In determining whether an activity is abnormally dangerous, the following factors are to be considered:
(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.
Comment:
a. This Section deals only with the factors which determine whether an activity is abnormally dangerous. The general principle of strict liability for abnormally dangerous activities is stated in § 519. The limitations upon strict liability for abnormally dangerous activities are stated in §§ 521-524A.
b. Distinguished from negligence. The rule stated in § 519 is applicable to an activity that is carried on with all reasonable care, and that is of such utility that the risk which is involved in it cannot be regarded as so great or so unreasonable as to make it negligence merely to carry on the activity at all. (See § 282). If the utility of the activity does not justify the risk it creates, it may be negligence merely to carry it on, and the rule stated in this Section is not then necessary to subject the defendant to liability for harm resulting from it.
c. Relation to nuisance. If the abnormally dangerous activity involves a risk of harm to others that substantially impairs the use and enjoyment of neighboring lands or interferes with rights common to all members of the public the impairment or interference may be actionable on the basis of a public or a private nuisance. (See § 822, and Comment a under that Section). The rule of strict liability stated in § 519 frequently is applied by many courts in these cases under the name of "absolute *257 nuisance," even when the harm that results is physical harm to person, land or chattels.
d. Purpose of activity. In the great majority of the cases that involve abnormally dangerous activities the activity is carried on by the actor for purposes in which he has a financial interest, such as a business conducted for profit. This, however, is not necessary for the existence of such an activity. The rule here stated is equally applicable when there is no pecuniary benefit to the actor. Thus a private owner of an abnormally dangerous body of water who keeps it only for his own use and pleasure as a swimming pool is subject to the same liability as one who operates a reservoir of water for profit.
e. Not limited to the defendant's land. In most of the cases to which the rule of strict liability is applicable the abnormally dangerous activity is conducted on land in the possession of the defendant. This, again, is not necessary to the existence of such an activity. It may be carried on in a public highway or other public place or upon the land of another.
f. "Abnormally dangerous." For an activity to be abnormally dangerous, not only must it create a danger of physical harm to others but the danger must be an abnormal one. In general, abnormal dangers arise from activities that are in themselves unusual, or from unusual risks created by more usual activities under particular circumstances. In determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) of this Section are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily. Because of the interplay of these various factors, it is not possible to reduce abnormally dangerous activities to any definition. The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care. In other words, are its dangers and inappropriateness for the locality so great that, despite any usefulness it may have for the community, it should be required as a matter of law to pay for any harm it causes, without the need of a finding of negligence.
Comment on Clauses (a) and (b):
g. Risk of harm. An activity that is abnormally dangerous ordinarily involves a high degree of risk of serious harm to the person, land or chattels of others. The harm threatened must be major in degree, and sufficiently serious in its possible consequences to justify holding the defendant strictly responsible for subjecting others to an unusual risk. It is not enough that there is a recognizable risk of some relatively slight harm, even though that risk might be sufficient to make the actor's conduct negligent if the utility of his conduct did not outweigh it, or if he did not exercise reasonable care in conducting it. If the potential harm is sufficiently great, however, as in the case of a nuclear explosion, the likelihood that it will take place may be comparatively slight and yet the activity be regarded as abnormally dangerous.
Some activities, such as the use of atomic energy, necessarily and inevitably involve major risks of harm to others, no matter how or where they are carried on. Others, such as the storage of explosives, necessarily involve major risks unless they are conducted in a remote place or to a very limited extent. Still others, such as the operation of a ten-ton traction engine on the public highway, which crushes conduits beneath it, involve such a risk only because of the place where they are carried on. In determining whether there is such a major risk, it may therefore be necessary to take into account the place where the activity is conducted, as to which see Comment j.
Comment on Clause (c):
h. Risk not eliminated by reasonable care. Another important factor to be taken into account in determining whether the activity is abnormally dangerous is the impossibility *258 of eliminating the risk by the exercise of reasonable care. Most ordinary activities can be made entirely safe by the taking of all reasonable precautions; and when safety cannot be attained by the exercise of due care there is reason to regard the danger as an abnormal one.
There is probably no activity, unless it is perhaps the use of atomic energy, from which all risks of harm could not be eliminated by the taking of all conceivable precautions, and the exercise of the utmost care, particularly as to the place where it is carried on. Thus almost any other activity, no matter how dangerous, in the center of the Antarctic continent, might be expected to involve no possible risk to any one except those who engage in it. It is not necessary, for the factor stated in Clause (c) to apply, that the risk be one that no conceivable precautions or care could eliminate. What is referred to here is the unavoidable risk remaining in the activity, even though the actor has taken all reasonable precautions in advance and has exercised all reasonable care in his operation, so that he is not negligent. The utility of his conduct may be such that he is socially justified in proceeding with his activity, but the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it. Thus the manufacture in a city of certain explosives may involve a risk of detonation in spite of everything that the manufacturer may reasonably be expected to do; and although he may not be negligent in manufacturing them at all, he is subject to strict liability for an abnormally dangerous activity.
A combination of the factors stated in Clauses (a), (b) and (c), or sometimes any one of them alone, is commonly expressed by saying that the activity is "ultrahazardous," or "extra-hazardous." Liability for abnormally dangerous activities is not, however, a matter of these three factors alone, and those stated in Clauses (d), (e), and (f) must still be taken into account.
As to strict liability for ground damage resulting from aviation, see § 520A.
Comment on Clause (d):
I. Common usage. An activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community. It does not cease to be so because it is carried on for a purpose peculiar to the individual who engages in it. Certain activities, notwithstanding their recognizable danger, are so generally carried on as to be regarded as customary. Thus automobiles have come into such general use that their operation is a matter of common usage. This, notwithstanding the residue of unavoidable risk of serious harm that may result even from their careful operation, is sufficient to prevent their use from being regarded as an abnormally dangerous activity. On the other hand, the operation of a tank or any other motor vehicle of such size and weight as to be unusually difficult to control safely, or to be likely to damage the ground over which it is driven, is not yet a usual activity for many people, and therefore the operation of such a vehicle may be abnormally dangerous.
Although blasting is recognized as a proper means of excavation for building purposes or of clearing woodland for cultivation, it is not carried on by any large percentage of the population, and therefore it is not a matter of common usage. Likewise the manufacture, storage, transportation and use of high explosives, although necessary to the construction of many public and private works, are carried on by only a comparatively small number of persons and therefore are not matters of common usage. So likewise, the very nature of oil lands and the essential interest of the public in the production of oil require that oil wells be drilled, but the dangers incident to the operation are characteristic of oil lands and not of lands in general, and relatively few persons are engaged in the activity.
The usual dangers resulting from an activity that is one of common usage are not regarded as abnormal, even though a serious risk of harm cannot be eliminated by all reasonable care. The difference is sometimes *259 not so much one of the activity itself as of the manner in which it is carried on. Water collected in large quantity in a hillside reservoir in the midst of a city or in coal mining country is not the activity of any considerable portion of the population, and may therefore be regarded as abnormally dangerous; while water in a cistern or in household pipes or in a barnyard tank supplying cattle, although it may involve much the same danger of escape, differing only in degree if at all, still is a matter of common usage and therefore not abnormal. The same is true of gas and electricity in household pipes and wires, as contrasted with large gas storage tanks or high tension power lines. Fire in a fireplace or in an ordinary railway engine is a matter of common usage, while a traction engine shooting out sparks in its passage along the public highway is an abnormal danger.
Comment on Clause (e):
j. Locality. Another factor to be taken into account in determining whether an activity is abnormally dangerous is the place where it is carried on. If the place is one inappropriate to the particular activity, and other factors are present, the danger created may be regarded as an abnormal one.
Even a magazine of high explosives, capable of destroying everything within a distance of half a mile, does not necessarily create an abnormal danger if it is located in the midst of a desert area, far from human habitation and all property of any considerable value. The same is true of a large storage tank filled with some highly inflammable liquid such as gasoline. Blasting, even with powerful high explosives, is not abnormally dangerous if it is done on an uninhabited mountainside, so far from anything of considerable value likely to be harmed that the risk if it does exist is not a serious one. On the other hand, the same magazine of explosives, the hugh storage tank full of gasoline or the blasting operations all become abnormally dangerous if they are carried on in the midst of a city.
So likewise, the collection of large quantities of water in irrigation ditches or in a reservoir in open country usually is not a matter of any abnormal danger. On the other hand, if the reservoir is constructed in a coal mining area that is honeycombed with mine passages, or on a bluff overhanging a large city or if water is collected in an enormous standing tank above the same city, there is abnormal danger and strict liability when, without any negligence, the water escapes and does harm.
In other words, the fact that the activity is inappropriate to the place where it is carried on is a factor of importance in determining whether the danger is an abnormal one. This is sometimes expressed, particularly in the English cases, by saying there is strict liability for a "non-natural" use of the defendant's land.
There are some highly dangerous activities, that necessarily involve a risk of serious harm in spite of all possible care, that can be carried on only in a particular place. Coal mining must be done where there is coal; oil wells can be located only where there is oil; and a dam impounding water in a stream can be situated only in the bed of the stream. If these activities are of sufficient value to the community (see Comment k), they may not be regarded as abnormally dangerous when they are so located, since the only place where the activity can be carried on must necessarily be regarded as an appropriate one.
Comment on Clause (f):
k. Value to the community. Even though the activity involves a serious risk of harm that cannot be eliminated with reasonable care and it is not a matter of common usage, its value to the community may be such that the danger will not be regarded as an abnormal one. This is true particularly when the community is largely devoted to the dangerous enterprise and its prosperity largely depends upon it. Thus the interests of a particular town whose livelihood depends upon such an activity as manufacturing cement may be such that cement plants will be regarded as a normal activity for that community notwithstanding the risk of serious harm from the emission of cement dust. There is an analogy here to the consideration of the same elements *260 in determining the existence of a nuisance, under the rule stated in § 831; and the Comments under that Section are applicable here, so far as they are pertinent.
Thus in Texas and Oklahoma, a properly conducted oil or gas well, at least in a rural area, is not regarded as abnormally dangerous, while a different conclusion has been reached in Kansas and Indiana. California, whose oil industry is far from insignificant, has concluded that an oil well drilled in a thickly settled residential area in the city of Los Angeles is a matter of strict liability.
In England, "a pluvial country, where constant streams and abundant rains make the storage of water unnecessary for ordinary or general purposes," a large reservoir in an inappropriate place has been found to be abnormally dangerous. In west Texas, a dry land whose livestock must have water, such a reservoir is regarded as "a natural and common use of the land." The same conclusion has been reached by many of the western states as to irrigation ditches.
Comment:
1. Function of court. Whether the activity is an abnormally dangerous one is to be determined by the court, upon consideration of all the factors listed in this Section, and the weight given to each that it merits upon the facts in evidence. In this it differs from questions of negligence. Whether the conduct of the defendant has been that of a reasonable man of ordinary prudence or in the alternative has been negligent is ordinarily an issue to be left to the jury. The standard of the hypothetical reasonable man is essentially a jury standard, in which the court interferes only in the clearest cases. A jury is fully competent to decide whether the defendant has properly driven his horse or operated his train or guarded his machinery or repaired his premises, or dug a hole. The imposition of strict liability, on the other hand, involves a characterization of the defendant's activity or enterprise itself, and a decision as to whether he is free to conduct it at all without becoming subject to liability for the harm that ensues even though he has used all reasonable care. This calls for a decision of the court; and it is no part of the province of the jury to decide whether an industrial enterprise upon which the community's prosperity might depend is located in the wrong place or whether such an activity as blasting is to be permitted without liability in the center of a large city.

On Rehearing
JONES, Justice.
On application for rehearing, Appellees (supported by amicus curiae brief) contend, inter alia, that the Court of Civil Appeals and not this Court has exclusive jurisdiction of this appeal. Because the dissent and not the majority opinion addressed this jurisdictional issue, we accede to Appellees' insistence that we do so.
The Court of Civil Appeals jurisdiction is fixed by Code 1975, § 12-3-10:
"The court of civil appeals shall have exclusive appellate jurisdiction of all civil cases where the amount involved, exclusive of interest and costs, does not exceed $10,000.00 ..."
In the context of the instant case, the key phrase is "where the amount involved ... does not exceed $10,000.00." One of the substantive issues presented by this appeal was the propriety of the trial court's order disallowing Plaintiffs' amendments in circuit court. If allowed, each of the Plaintiff's claims would exceed $10,000. Not until this Court entertained the appeal and ruled adversely to Plaintiffs on this issue could it be said that each of the consolidated claims did not exceed $10,000 in amount. Either this Court had jurisdiction in the first instance (and, if so, retained jurisdiction for the purpose of full disposition of the appeal) or it did not have the power to decide any issue presented.
We are aware that Appellees' position is supported by the following sentence from the dissenting opinion: "Affirmance by the majority of the order denying the amendments to plaintiffs' complaints seeking more than five thousand dollars as damages is positive concession that these appeals are not within the jurisdiction of this court." *261 By way of authority the dissent concludes: "To rule otherwise, the majority would, perforce, repeal Rule 13(j), ARCP."
The minority's proposition is self answering. "Affirmance by the majority" of the issue relating to the amendments necessarily (and "perforce," if you please) means that this Court assumed jurisdiction of an appeal where the amount involved exceeded $10,000. Such "affirmance" constitutes an enforceable order only if this Court acted with jurisdiction. To be sure, once the appeal was entertained and the trial court's order disallowing the amendments was affirmed, each of the claims involved an amount less than $10,000. But we know of no authority (nor have we been aided by Appellees, amicus curiae, or the dissenters in this regard) for the splitting of appellate jurisdiction under these circumstances. This Court cannot take jurisdiction for the disposition of one issue, and then, in light of its holding, dismiss (or transfer) the appeal for lack of jurisdiction.
Suppose, for example, that a jury verdict were rendered, and judgment entered thereon, for $15,000. On motion for J.N.O.V., defendant's only ground insists that $9,000 is the highest award supported by the evidence. On appeal, the only issue presented is the propriety of the trial court's order overruling defendant's motion. Under the rationale urged by appellees, this Court's reversal (thus fixing the plaintiff's judgment at $9,000) would strip it of jurisdiction and mandate dismissal of the appeal, thus leaving the $15,000 judgment undisturbed; and this for the reason that, if this Court has no jurisdiction, it had no power to reverse on the damage issue.
Likewise, here, if we have no jurisdiction, we have no power to affirm on the amendment issue. And we have been careful to note that Appellees' lack of jurisdiction argument is premised on the validity of our order affirming the trial court's denial of the amendments to the ad damnum clause of each of Plaintiff's claims. In the absence of a judgment fixing the amount of recovery, the amount claimed in the pleadings is the only guide by which jurisdiction as between this Court and the Court of Civil Appeals may be determined. Although unsuccessful in their efforts to assert a higher claim on their appeal to circuit court, Plaintiffs' proffered amendments put in controversy amounts in excess of $10,000 for each claim. Jurisdiction of this consolidated appeal is with this Court.
OPINION EXTENDED AND APPLICATION FOR REHEARING OVERRULED.
FAULKNER, SHORES and ADAMS, JJ., concur.
TORBERT, C. J., concurs to deny application for rehearing on the jurisdictional issue; but he would grant rehearing on the substantive issue.
MADDOX, J., concurs specially.
ALMON, EMBRY and BEATTY, JJ., dissent.
MADDOX, Justice (concurring specially).
The applicants for rehearing ask:
"What pressing reasons clamor for adopting of the rule of liability without fault, and the abandonment of the rule of negligence?"
The appellees also state that given this state's scintilla rule, there is no need for changing the standard of negligence as applied to blasting. They say: "It is axiomatic that in light of this state's scintilla rule, a properly prepared case demonstrating even the slightest gleam or glimmer of negligence is a case to be submitted for jury determination. There are many blasting cases that have come before this Court that demonstrate the ease with which this can be done." They then cite Crawford Coal Company v. Stephens, 382 So.2d 536 (Ala. 1980). The applicants for rehearing also state that the decision of the majority was made without the necessary scientific and empirical data required for a comprehensive decision and without the input necessary to determine what effect the decision would have on the development of Alabama and the growth of its industry.
The applicants for rehearing, of course, raise some interesting questions, questions *262 which I wrestled with conscientiously before concurring in the original opinion. Let me now state the reasons why the present state of the law compelled me to take the position I took.
As the applicants correctly point out, Crawford Coal is an example of the ease with which negligence can be proved. If the majority opinion totally abolished the fault concept in blasting cases, as applicants for rehearing fear it does, and as some of the dissenters contend it does, then the majority opinion would be bad law, but the majority opinion clearly retains the fault concept by requiring proof of proximate causation. A close reading of Crawford Coal against the backdrop of Coalite's Inc. v. Weeks, 284 Ala. 219, 224 So.2d 251 (Ala. 1969), shows that the step taken by this decision is indeed only a short one. It certainly is not a giant leap.
I share some of the same concerns the applicants have about the role of this Court when faced with a rule which no longer serves the public good. In Henderson v. Wade Sand and Gravel Corp., 388 So.2d 900 (Ala.1980), I dissented on the ground that if the rule of law stated in prior decisions of this Court no longer served the public good and did not strike a balance between the competing interests, the remedy should come from the Legislature which was best suited to consider and evaluate the competing rights, duties and societal interests. The question may be asked, and appropriately so, why this case is different.
I think this case is different, because in Crawford Coal, supra, this Court affirmed a judgment based upon proof which essentially only connected the blasting as the proximate cause of the injury.
The majority decision still requires a plaintiff to show that blasting was the proximate cause of the plaintiff's injury and damage. While the decision does lighten plaintiff's burden of proof quantitatively, it does not necessarily do so qualitatively.
EMBRY, Justice (dissenting):
The reasoning of the majority opinion on rehearing regarding the jurisdictional question turning on "the amount involved" is even more incredible than that employed upon original deliverance! By a convoluted and contorted illogic, the amount involved suddenly becomes not what was actually claimed in the ad damnum clause of the dismissed Count One of each of the complaints but rather what was claimed in the impermissible and disallowed amendments to those counts. This being the case, this court had no jurisdiction. This fact should have been noted at the time the record reached this court and the cases should have thereupon been transferred to the Court of Civil Appeals. See Williamson v. Birmingham Transit Corp., 344 So.2d 489 (Ala.1977); cf. Great Central Insurance Company v. Edge, 292 Ala. 613, 298 So.2d 607 (1974). Under this state of the law, anytime a litigant wishes to bypass the Court of Civil Appeals, all that need be done is to proffer some known illegal or impermissible claim or amendment that recites a sum in excess of ten thousand dollars and in spite of it being properly stricken or disallowed, behold, you now have direct access to this court. What more specious reasoning can there be?
I reiterate my views concerning the merits, previously expressed in the original dissent.
ALMON and BEATTY, JJ., concur.
NOTES
[1] Five separate claims were consolidated in the trial court and on appeal.
[2] See, e. g., Coalite Inc. v. Weeks, 284 Ala. 219, 224 So.2d 251 (1969); Milford v. Tidwell, 276 Ala. 110, 159 So.2d 621 (1963); Vulcan Materials Co. v. Grace, 274 Ala. 653, 151 So.2d 229 (1963); Central Iron & Coal Co. v. Vandenheuk, 147 Ala. 546, 41 So. 145 (1906).
[3] See, e. g., Lehigh Portland Cement Co. v. Dobbins, 282 Ala. 513, 213 So.2d 246 (1968); Vulcan Materials Co. v. Grace, 274 Ala. 653, 151 So.2d 229 (1963); Bessemer Coal, Iron & Land Co. v. Doak, 152 Ala. 166, 44 So. 627 (1907).
[4] We note with interest that the legal scholars' debate in this field centers not on the trespass/trespass on the case dichotomy; rather, as J. Fleming, The Law of Torts 40 (4th ed. 1971), states:

"In many American blasting cases, it has been held that damage from flying rocks is trespass, but from vibration or concussion at most nuisance. This proposition, which has been castigated as a marriage of legal technicality with scientific ignorance, is nonetheless commendable because any encroachment of trespass on the field traditionally occupied by nuisance would lead to undesirable restrictions on users of land." (Emphasis added.)
[5] Blasting regulations are specifically promulgated under the Coal Surface Mining Reclamation Act in § 9-16-41, Code 1975. Of course, those in the blasting industry argue that these regulations are far too restrictive to apply in any context other than mining.
[6] Because of its utility in the management of a blasting case in the trial court, we append hereto a copy of the Restatement (Second) of Torts, §§ 519 and 520, with Comments.
[7] We note that this aspect of our holding, particularly the determination of the issue of "abnormally dangerous activity," is at odds with Comment (1) of the Restatement. Consistent with our holdings in Casrell and Atkins, we adhere to the traditional rule of submitting both the issue of culpability and proximate cause to the jury except where no dispute of fact is presented on the issue by the evidence.